Filed 4/20/23  P. v. Thomas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN JASON THOMAS,<br><br>    Defendant and Appellant. | H047082<br>(Santa Cruz County<br>Super. Ct. No. 17CR02251) |

A jury convicted defendant John Jason Thomas of offenses including attempted premeditated murder (Pen. Code, §§ 664, 187)[1] and assault with a firearm (§ 245, subd. (a)(2)) against multiple victims.  Of the multiple claims Thomas raises on appeal, we find merit in his contention that the trial court's error in limiting cross-examination of a key prosecution witness, both independently and as amplified by prosecutorial error in arguing the reasonable doubt standard, requires reversal of his convictions under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  Because we reject his further challenges to the constitutionality of the delay in refiling the charges and the sufficiency of the evidence, however, there exists no legal impediment to retrial on remand.

---

[1] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. *The First Trial, Mistrial, and the Operative Information*

In 2013, the Santa Cruz County District Attorney initially charged Thomas with the instant offenses under case number F26035.[2] The district attorney then charged Thomas in two separate complaints with criminal conduct he allegedly committed while detained in county jail. Although prosecution of the two jail matters proceeded, the district attorney dismissed case number F26035.[3]

In April 2015, Thomas was convicted of the two jail matters and sentenced to prison, but two years later, a panel of this court reversed the convictions. (*People v. Thomas* (Apr. 27, 2017, H042200) [nonpub. opn.].)

In April 2017, shortly before the reversal in the unrelated appeal, the district attorney refiled the instant charges under a new case number, 17CR02551.[4] Although

---

[2] We rely on Thomas's and the prosecutor's respective recitation of the procedural history of case number F26035, as the parties do not dispute the accuracy of the referenced dates and the trial record in case number F26035 is not included with the record on appeal.

[3] In the motion, Thomas's counsel noted that "[t]he exact date of the dismissal is not readily available," but the fact of the prior dismissal was referenced in court at a hearing held on April 10, 2015. Counsel further alleged on information and belief that the purpose of dismissal was to await completion of unspecified forensic testing.

[4] In part, the information charged Thomas with attempted willful, deliberate, premediated murder as to victim H.A. (§§ 664, 187, subd. (a); count 1), attempted carjacking with a deadly weapon as to victim H.A. (§§ 664, 215, subd. (a); count 2), attempted carjacking with a deadly weapon as to victim C.G. (§§ 664, 215, subd. (a); count 3), assault with a firearm as to victim P.G. (§ 245, subd. (a)(2); count 4), attempted carjacking with a deadly weapon as to victim A.A. (§§ 664, 215, subd. (a); count 5), assault with a firearm as to victim A.A. (§ 245, subd. (a)(2); count 6), assault with a firearm as to victim O.S. (§ 245, subd. (a)(2); count 7), possession of a firearm with a prior violent conviction (§ 29900, subd. (a)(1); count 8), and carrying a loaded firearm by a felon (§ 25850, subd. (c)(1); count 9).

2

Thomas initially waived his statutory speedy trial rights, he withdrew his time waiver in September 2017 and proceeded to trial in January 2018. When the jury deadlocked, the trial court declared a mistrial later that month.

Between February and August 2018, the trial court first continued Thomas's retrial based on a defense motion and later on the need to appoint new counsel due to defense counsel's conflict of interest. Upon the appointment of successor counsel in August 2018, Thomas waived time to November 2018, for trial setting.

In January 2019, Thomas filed a motion to dismiss the information, arguing that his Sixth Amendment right to a speedy trial had been violated by the district attorney's failure to refile the charges until 2017, after this court reversed his convictions in the jail matters.

Before the trial court ruled on Thomas's motion to dismiss, the district attorney filed the operative amended information, charging Thomas with attempted willful, deliberate, premeditated murder as to victim H.A. (§§ 664, 187, subd. (a); count 1), attempted carjacking with a deadly weapon as to victim H.A. (§§ 664, 215, subd. (a); count 2), attempted second degree robbery as to victim H.A. (§§ 664, 211; count 3), assault with a firearm as to victim P.G. (§ 245, subd. (a)(2); count 4), assault with a firearm as to victims O.S. and A.A. (§ 245, subd. (a)(2); count 5), possession of a firearm with a prior violent conviction (§ 29900, subd. (a)(1); count 6), and carrying a loaded firearm by a felon (§ 25850, subd. (c)(1); count 7).[5] As to counts 1 through 3, it was alleged that Thomas personally used a firearm within the meaning of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b). As to count 2, it was alleged that Thomas personally used a firearm within the meaning of section 12022,

---

[5] Counts 1 through 3 were alleged as serious felonies under section 1192.7, subdivision (c), and counts 2 and 3 were alleged as violent felonies under section 667.5, subdivision (c).

3

subdivision (b)(2). And finally, as to counts 4 and 5, Thomas was alleged to have personally used a firearm within the meaning of sections 12022.53, subdivisions (a) and (d). The amended information further alleged that Thomas had one prior strike conviction (§ 667, subd. (b)-(i)) for committing an assault with a deadly weapon (§ 245, subd. (a)(1)) and had served three prior prison terms (§ 667.5, subd. (b)).

After the amended information was filed, the trial court denied Thomas's motion to dismiss.

## B. *The Second Trial*

### 1. *The Prosecution's Case*

#### a. *The Offenses*

The evening of December 18, 2013, C.G. was on her way to sell tamales on Bixby Street in Santa Cruz, along with her partner, H.A., her then 15-year-old son P.G., and her infant grandson. H.A. was driving, and C.G. sat in the front passenger seat, with P.G. and C.G.'s grandson sitting in the back.[6] Outside the home of customer A.B., P.G. got out of the car to go to the house.

A man walking down the sidewalk crossed in front of the car. Seeing the occupants, he tried to open the car door, which was locked from the inside. The man took out a gun and pointed it at the car, toward H.A. and C.G. The man struck the window with the gun at one point.

---

[6] C.G. initially told the police that she was the one driving that evening, not H.A., because H.A. had just been in court that morning for a suspended license. When H.A. first spoke to the police that evening, he also told them that he had not been driving because he just had a court hearing that day and had pleaded no contest to driving without a valid license. H.A. had a prior conviction for felony driving under the influence with another prior conviction back in 2012.

4

Sixteen-year-old O.S. and her mother, A.A., were en route to their home on Bixby Street when they saw the man banging on the car window.[7] O.S. and her mother thought the man might need help getting in his car, so A.A., who was driving, pulled over. The man immediately pointed a gun at them, so O.S. told her mother to drive off. They called 911 from their home a few doors away. Computer-aided dispatch records reflect that O.S.'s 911 call—the first regarding this incident—was at 6:48:06 p.m.

Meanwhile, C.G. yelled for P.G., who was walking back to the car, to call the police, and the man started to point the gun at P.G. As C.G. screamed, "Not my son," P.G. ran back to A.B.'s house and was let inside.

P.G. told A.B. that his family was being robbed. A.B. looked out the window and saw someone at the other side of the car brandishing a shiny silver handgun and either "talking or doing something concerning the driver."

H.A. tried to calm the man down and told him that they had a baby in the car. C.G. told the man that he could take the car if he wanted. H.A. got out of the car, told the man that he did not have any money, and tried to give the man his keys. The man did not want them. C.G. grabbed her grandson and ran to A.B.'s house without looking back.

A.B.'s husband, S.B., went out and saw that there was a man holding "a pistol, a revolver" in the air, banging the top of the car, and yelling. The man saw S.B., turned to face him, and pointed the gun at S.B. The man then raised the gun in the air and shook it. S.B. ducked down, and either he or A.B. dialed 911 at 6:48:23 p.m.

The man yelled at H.A. to drive, but H.A. told him that he could not. The man looked nervous and desperate, and he waved the gun in different directions, pointing it variously toward H.A.'s feet, head, and chest.

---

[7] O.S. was unavailable at trial, so her recorded testimony was read into evidence.

5

H.A. testified that at one point he heard the gun click, though it did not fire. At the first trial, however, H.A. had been unable to recall whether the man had pulled the trigger. When H.A. heard the click, the man was not pointing the gun at anything specific but was waving it in all directions, "pointing towards the front." H.A. testified, demonstrating, that the man was "just going like this (indicating) but pointing at all sides."[8] Asked by the prosecutor for clarification, H.A. testified the man was pointing the gun "[t]o my body"; asked if this included his chest, H.A. replied, "Yes." The man then "started handling the handgun, and [H.A. didn't] know if it was to fix it or what."

S.N., who lived on Bixby Street, heard yelling and someone saying, "Get the fuck out of the car." She walked out and saw a man standing outside the driver's side window with his arm pulled back, shouting at the car's driver. S.N. did not see what the man had in his hand. S.N. ducked, called 911 at 6:50:12 p.m., and the police arrived less than a minute later.

By the time the police arrived, the man had already left the scene. H.A. recalled that as more people started appearing, the man slowly backed away from him, and H.A. saw him walk towards a laundromat at the end of the street before turning out of sight.

b.   *The Police Response*

The initial radio dispatch to officers described the suspect as "a black male in a gray hooded sweatshirt or sweater" last seen on foot going down Barson Street towards the Jessie Street marsh.[9]

Officers arrived at the scene on Bixby Street at 6:51 p.m., three minutes after the first 911 call. Although there were smudges and marks on the driver's side window,

---

[8] We understand "(indicating)" to be the court reporter's comment. The record is silent as to the nature of H.A.'s nonverbal indication.

[9] The marsh was approximately two and a half to three blocks away from the scene of the crime, and there was a 7-11 on Ocean Street that was around 500 feet away.

these yielded no high-quality fingerprints. A palm print taken from the window matched H.A., but the fingerprints on the window were inconclusive. A forensic analyst compared H.A.'s and Thomas's comprehensive fingerprints to the latent prints found on the window, but she did not find any corresponding area of skin between the latent prints and Thomas's and H.A.'s prints.

About 6:59 p.m., responding officers detained Thomas, who was spotted standing in the middle of Ocean Street near Barson Street and La Esperanza market.[10] Thomas was wearing gray sweatpants and a gray sweatshirt—without a hood—and had "obvious" tattoos. He was breathing heavily and was sweating. His eyes were also "wide open," and he had "a look of panic or nervousness."[11]

Thomas was cooperative, and when officers searched him, they found nothing on his person. Thomas said he had been drinking; later testing showed his blood alcohol concentration to be 0.16 percent.

Officers brought a number of the eyewitnesses to view Thomas as he was detained in the field. The first eyewitness identification of Thomas was at 7:04 p.m., 16 minutes after the first 911 call.

### c.   *The Eyewitness Identifications*

#### i.   *H.A.*

The night of the crime, H.A. had described the perpetrator to officers as "tall, fat with brown skin" and wearing a gray hoodie sweatshirt and gray sweatpants. When police took H.A. near Ocean Street to see if he could identify the suspect they had

---

[10] At trial, a district attorney investigator who went to the scene later opined that it took about three minutes at a "leisurely walking pace" to go from the scene of the crime on Bixby to the market where Thomas was later found.

[11] At Thomas's first trial, the officer who detained Thomas did not testify that Thomas appeared to be sweating.

detained, H.A. identified the suspect as the assailant because he "was wearing the same clothing, . . . the same cap and . . . was the same height, all of it." After the in-field identification, H.A. gave a slightly different account of the perpetrator's clothing as a "gray sweater," without reference to a hood.

H.A. testified that his assailant was Black, a little taller than H.A., and well-built.

H.A. identified Thomas in the courtroom as the man he had identified in the field. During Thomas's first trial, H.A. had testified that he "didn't remember a lot of things," including what the perpetrator was wearing or how the gun looked. Asked in the first trial "who in the courtroom looks like" the perpetrator, H.A. had answered, "I cannot say. I can't say exactly whether it was this person or that. There's a person who – the dark-skinned person. It could be him, but I don't know." When asked, "[N]ow are you talking about the person sitting over there?" H.A. responded, "[W]ell, he's the only dark-skinned person here." Asked "[Y]ou don't know if that's the same person?" H.A. said no.

### ii.    *P.G.*

P.G. told the police that he thought the perpetrator might be on drugs or was "crazy" because of the way the man had been behaving. Fifteen to 20 minutes after the crime, the police drove P.G. twice past Thomas in the field; the first time P.G. saw Thomas from a distance, and the second time he got a closer view. Both times, P.G. identified Thomas as the perpetrator. P.G. did not base his identification on Thomas's facial features but on his clothing, his size, and his hairstyle.

At trial, P.G. recalled that the perpetrator was "African American, big size." The man appeared to be wearing a gray jacket and gray sweatpants. The man did not have a hood on, and P.G. saw that he did not have a lot of hair and was bald on top. P.G. did not see any tattoos on the man. The man had been holding a shiny silver revolver.

P.G. identified Thomas in the courtroom as "the person [he] recognized that day."

8

### iii. *C.G.*

Speaking to police the night of the crime, C.G. described the gun as silver and small. Before she participated in the in-field show up, an officer relied on H.A. to admonish C.G. that the person she was about to see "may or may not be that same person and to keep an open mind." Both H.A. and P.G., however, told her that the police had caught the perpetrator. C.G. then identified Thomas in the field based on "the way he was dressed."

At trial, C.G. testified that the perpetrator was wearing a sweater, but she was unsure if it was gray or white.[12] He was also wearing "big, loose" pants. She thought the man was Black with a "strong" or medium build.[13]

Although C.G. identified Thomas in court as the assailant, she recalled that she had been unable to do so in Thomas's first trial. C.G. acknowledged that she was now able to identify Thomas because she remembered him at the prior trial.

### iv. *A.B. and S.B.*

A.B. described the perpetrator to the 911 dispatcher as "a light brown person, not really dark black and not really light Caucasian," who was "[k]ind of plump" and wearing a white sweatshirt. He had "just had a bit of hair" and did not have anything covering his head.

S.B. told the 911 dispatcher that the man was around 230 to 250 pounds and was wearing a white sweatshirt. He also described the man as "Mexican Latino."

---

[12] C.G. could not recall that at Thomas's first trial, she testified that the assailant was wearing black or similar colors.

[13] Asked if she had testified in a prior hearing that the perpetrator was "huskier," C.G. refreshed her recollection by having a transcript of her prior testimony interpreted back into Spanish and answered, "That's what I said, he was rather strong."

At trial, S.B. testified that he saw the man's face "clearly," and the man appeared to be around "five-eight, five-ten and probably weighed about 200 pounds" and had "very little hair, dark skin." The gun the man was holding looked like a revolver and was metallic.

S.B. had been unable to identify Thomas in the field the night of the offense because Thomas's face "contorted" as he squinted into the light the police were shining on his face. S.B., however, told the police that he thought Thomas looked familiar and that Thomas had the same build, same sweatshirt, and same hair as the assailant.

###### v.    *O.S. and A.A.*

O.S. spoke to the police that evening and helped translate for her mother, A.A., who spoke Spanish, and answered the police's questions on both her mother's behalf and her own. O.S. told the police that her mother said that the assailant "maybe" had facial hair. O.S. thought the assailant was about 30 years old. He was wearing a white or light gray hoodie; O.S. told 911 the hoodie was white but may have been incorrect in her shock.

A few weeks later, the police showed O.S. several photographs of potential suspects. O.S. identified the man in photograph number 3 as looking "the most familiar"; Thomas's photograph was number 4.[14] A.A. was unable to identify anyone from the photo array.

In her trial testimony, O.S. described the perpetrator as African-American with a shiny gray gun that looked like a six-shooter gun from an old Western movie.

---

[14] The man in photograph number 3 was a resident of an assisted living facility in Watsonville. According to the facility's medication records for the date of the offense, the resident took his afternoon medication, which is generally administered between 4:00 and 6:00 p.m. A progress note in the records from the day before the offense indicated that the man generally "[g]oes out daily on the bus," returns home, and goes to sleep early at around 6:00 p.m.

10

### vi. *S.N.*

S.N. described the man that she had seen to the police, but it had been dark at the time, and the person was wearing dark clothes. She was "pretty sure" that the man was wearing a beanie or a hood or something similar. He was "not a skinny man but he wasn't like a huge dude."

### d. *The Gun and Execution of the Search Warrant*

The day after the crime, police found a .38 caliber silver revolver next to an apartment complex carport at 317 Ocean Street. Resting on top of some vegetation, the revolver did not appear to have been there for a long time, because there was no dust or dew on it. A spiderweb was visible on the hammer, however, and the revolver showed signs of rust.

The revolver was later determined to be a Smith & Wesson "Hopkins and Allen" made sometime between 1880 to 1910. The chamber between the cylinder and hammer no longer latched in place, and there was a large crack all the way across the top strap of the gun. The crack made the gun unsafe to shoot because it lacked structural integrity. The crack could also cause the hammer in the firing pin not to reach the round in the chamber.

When found, the revolver was loaded with five rounds of an incompatible type of ammunition—"Remington Peters .380 auto" rounds. Ammunition for a .38 caliber revolver features a "lip" intended to sit on the chamber side of the cylinder, to keep the round aligned with the firing pin rather than sliding away from the firing pin. The .380 caliber "auto" ammunition, which is slightly shorter and narrower than a .38 caliber revolver round, lacks this feature. Two of the rounds in the cylinder bore what two criminalists later identified as "very light" firing pin impressions, though the rounds were live; one of the two rounds had a toolmark on its sidewall.

11

Shown a photograph of the gun, O.S. said that it looked like the firearm that she had seen the assailant use.

After finding the gun, officers obtained a search warrant for an apartment on Broadway, where Thomas's father resided. In executing the warrant, officers found 54 rounds of Remington Peters .380 auto ammunition—42 loose rounds and 12 in a bag—contained in a shoebox, along with a fixed-blade knife, a pair of black gloves, and a yearbook belonging to Thomas's 21-year-old son, who sometimes stayed at the apartment. Of the .380 ammunition found in the apartment, two rounds from the bag of 12 exhibited markings consistent with a light firing pin strike.

No .380 caliber firearm was found inside the apartment. Other items that had Thomas's name on it were found inside the apartment.

Additional 9-millimeter ammunition was found in an adjacent shoebox, along with letters relating to Thomas's son. Thomas's son—"tall, very thin," with "dark brown hair" and tattoos—arrived as police were searching the apartment. He was carrying a 9-millimeter semiautomatic handgun loaded with 9-millimeter ammunition.

### e. *Firearm Testing and Forensic Analysis*

Aron Tripp, a district attorney investigator, test fired the revolver using primed .380 caliber casings.[15] The revolver consistently failed to fire except when angled up 45 degrees; even at 45 degrees, the revolver only fired one or two times out of five. Otherwise, pulling the trigger would cause the firing pin to merely "bounce the casing forward" without actually detonating the primer; the casing would then slide back. With each misfire, the firing pin left an indentation mark on the otherwise intact primer. Although the revolver—"if the circumstances were right with the cartridge in the proper

---

[15] The test fires used only casings and primer without gunpowder or projectiles because the damaged revolver was not otherwise safe to fire.

orientation to the breech face and the firing pin"—could detonate the primer and expend a .380 caliber automatic cartridge, it was unclear whether the projectile would be properly propelled through the barrel "or how effective it would be."

Criminalist Adam Lutz was tasked with deciphering whether firing pin impressions on the cartridges recovered from inside the cylinder of the revolver were made by the revolver. The firing pin impressions found on two of the five evidence cartridges recovered from the revolver were different from each other, and there was not enough information to determine whether the impressions were from the same revolver and firing pin. These firing impressions were also lighter than the marks Lutz was able to produce with the same revolver in a series of test misfires of primed .380 caliber casings. Lutz was able to reproduce firing pin impressions as light as those in the evidence rounds found in the revolver by inserting a brass rod down the revolver barrel and tapping the rod with a hammer to force the primer against the firing pin "in reverse." Even then, "there still wasn't much microscopic detail on the marks to make a conclusion whether it's an ID or whether it's excluded."

Criminalist John Murdock was given unfired .380 auto caliber cartridges that were taken both from the apartment of Thomas's father and from the gun itself. In Murdock's opinion, the firing pin impressions on the two rounds from the revolver "may possess sufficient microscopic detail for comparison purposes" and were "very similar in their overall appearance" to firing pin impressions he made in testing the revolver. As for the .380 cartridges taken from the apartment of Thomas's father, Murdock made casts of the light firing pin impressions found on two of the cartridges and compared these with casts of test-firing impressions that he made with the firing pin of the revolver. Based on his comparison of the casts, Murdock opined that the firing pin in the revolver had made the two light firing pin strikes on two cartridges found inside the apartment. Another expert in Murdock's laboratory reached the same conclusion.

13

On cross-examination, Murdock was questioned about "a report to the President of Forensic Science in Criminal Courts[:] Ensuring Scientific Validity of Feature[-]Comparison Methods" that questioned the scientific validity of forensic toolmark analysis. Murdock opined that "the PCASS report"[16] merely said that there wasn't enough "black box scientific studies" to support firearm and toolmark identification to determine an error rate. According to Murdock, the report ignored "hundreds of studies." Murdock characterized toolmark comparisons as "scientific" but acknowledged the comparison process was subjective in that different experts could reach different conclusions based on identical evidence.

DNA testing of swabs from the revolver's "rough areas" and sides of the trigger guards was inconclusive. No fingerprints of value were found on the revolver, and no fingerprints were found on the ammunition in its cylinder.

### 2. *The Defense*

In the defense case, Thomas sought variously to discredit the eyewitness identification, establish the absence of physical evidence implicating him in handling the revolver, and establish an alibi.

#### a. *Eyewitness and Identification Expert*

Dr. Daniel Reisberg, an expert in the reliability of witness memories and the practice of conducting police showups or lineups, testified that multiple studies have shown that eyewitnesses to real crimes choose "fillers" in police lineups—photographs of individuals the police put in a lineup that police know are "nowhere close to the crime"—

---

[16] We understand the reference to "PCASS" in the reporter's transcript to be a clerical error and a mistranscription of the term "PCAST"—the President's Council of Advisors on Science and Technology. (See <https://obamawhitehouse.archives.gov/blog/2016/09/20/pcast-releases-report-forensic-science-criminal-courts> [as of Apr. 20, 2023] archived at <http://perma.cc/TH4R-K9VW>.)

and make mistakes in their identifications around 30 to 35 percent of the time. According to Reisberg, confirmatory bias can impact eyewitness identification. For example, people often trust the police, and, as a result, when police officers take an eyewitness to an infield lineup, eyewitnesses may go into the process assuming that the police have apprehended the right suspect and that their role is merely confirmatory. In Reisberg's opinion, in-court identifications are, scientifically speaking, a "terrible way" to identify someone as there is only one person to identify. He urged that properly instructing eyewitnesses, such as informing them that the suspect may or may not be the perpetrator, before they make identifications can improve the quality of eyewitness evidence.

Reisberg opined that delays in presenting an eyewitness a show-up can be problematic because witness memories may fade. Alternatively, presenting the witness with a suspect too soon may lead a witness to infer from the suspect's prompt apprehension that the suspect must be the perpetrator.

Moreover, Reisberg observed that the duration of a witness's initial observation of a perpetrator also impacts the reliability of later identification, although there is no bright-line rule about how many seconds a person needs to memorize another person's facial features. Reisberg noted that studies have shown that a calm witness, forewarned of a coming "crime" and able to view the supposed "perpetrator" unobstructed for eight to ten seconds, will nonetheless misidentify the "perpetrator" in a lineup 70 to 75 percent of the time and "are 3 times more likely to get it wrong than to get it right in that setting."

According to Reisberg, other factors also impact identification. Lighting and the direction of the light can create strong shadows. Stress can also impact memory—it can have a "positive effect" if one wants a one-sentence summary of what transpired but not if you want additional details about what happened. Stress can also impact a witness's ability to verbally describe what happened. Reisberg further noted that the complexity of

15

the event may also impact memory—for example, a witness may focus on a gun over the perpetrator's face.

Furthermore, Reisberg testified that a witness's certainty in their identification can be impacted by multiple factors, and a witness can be artificially certain about what he or she saw. For example, he noted that a witness's certainty can be affected if someone who has already viewed a show-up tells the witness, "that's the guy." According to Reisberg, memories do not improve with time; instead, witnesses may experience "misplaced familiarity"—where a person initially unable to make an identification may, at a second viewing, think that a suspect looks familiar without appreciating why. In other words, the eyewitness may mistake recognition of the person from the show-up, lineup, or court appearance with recognition of the perpetrator from the commission of the crime.

For similar reasons, Reisberg concluded that in-field showups can be a "worrisome procedure." In his view, a recommended procedure is to arrest the perpetrator that has been identified through a show-up and then do any later identifications with a lineup. According to Reisberg, photo lineups are better than showups.

Considering a hypothetical that tracked how the in-field showups were conducted in this case, Reisberg opined that he would be "very, very careful about" relying on or giving great weight to the identifications.

### b. *DNA Expert*

Marc Taylor, a private lab director, testified as an expert in DNA analysis and interpretation. Taylor's lab conducted DNA testing on a swab that came from the revolver in the case. Because there was not enough DNA on any single area of the gun to test, Taylor combined the DNA samples from the rough area of the grips and the trigger area into one sample to conduct testing.

16

In 2014, Taylor's laboratory prepared a report that excluded Thomas as a contributor to the mixture of DNA profiles in the combined sample. Applying more current scientific practices at the time of trial, the lab would have characterized the DNA results as inconclusive. Nonetheless, Taylor opined that Thomas's DNA was not on the gun. The absence of a person's DNA on an object, however, did not mean that the person did not touch it, in Taylor's opinion.

### c. *Thomas's Testimony*

On December 18, 2013, Thomas was watching a basketball game with E.H., his girlfriend at the time, at his father's apartment at around 5:00 p.m.[17] He left his father's apartment sometime in the evening with $5 that E.H. had given him to purchase alcohol. At the liquor store, he purchased a bottle of whiskey for less than $5 and went down to the levee to drink. Thomas could not recall what happened to the change he received from the store. He went to an area of the levee where "a lot of us hang out that are homeless," but he did not see anyone else in the area at the time.[18]

After he finished his drink, he headed back toward Ocean Street, intending to buy another drink for E.H. at the 7-11. He had no money, but he planned to borrow someone's phone so he could call E.H.

As he was walking down Ocean Street, he saw a police car stop and start to back up in the middle of the street. Thomas asked the officer what was going on. The officer in the car detained Thomas at gunpoint. That evening, Thomas was wearing a sweatsuit

---

[17] E.H., called as a witness in the prosecution's case in chief, had been friends with Thomas for over 20 years and had dated him for two years. On the night of the offense, E.H. denied having given Thomas any money before he left the apartment. Thomas never came back, and E.H. went home.

[18] Thomas later testified that he been waiting for someone, but he got tired of waiting and left.

with a sweatshirt that did not have a hood. At the time, he was missing two front teeth and had a tattoo on his neck and eye.

Thomas smoked, had asthma, and was not in the best of shape, but he did not recall that he was sweating that evening. He initially told officers that he had been walking to the 7-11 to buy beer for himself. He also gave officers a different name for his girlfriend and said he did not know his girlfriend's number even though he later called E.H. that night. Thomas did not want to say where E.H. was because she was at his father's apartment. He also did not tell the police where his father lived. According to Thomas, he did not want the police to know about E.H. because she had not been paying child support, and he did not want her to get in trouble.

Thomas denied having a gun with him that night and denied involvement in the confrontation on Bixby Street. He denied knowing anything about the gun involved in this case and testified that he had never seen the gun before. Thomas had access to the dining room where some of the ammunition was found. But Thomas did not know that there was ammunition inside his father's apartment, and he generally did not search his son's drawers or living areas. Thomas also did not live at his father's apartment; he only occasionally stayed overnight. He did not have keys to the apartment, and he got inside by knocking if his father was home. Although Thomas left some of his belongings inside the apartment and occasionally listed the apartment as his address, Thomas himself was a transient.

In 2006, Thomas was convicted of a felony violation of section 245, subdivision (a)(1), an assault with a deadly weapon that was not a gun. At the time of the crime, he was on parole and was not permitted to drink or possess alcohol, or to go to liquor stores or bars.

18

**C.**     *The Verdict and Sentencing*

On March 1, 2019, the jury found Thomas not guilty on count 2 (attempted carjacking of victim H.A.) and guilty on all other counts as charged. The jury also found all the alleged firearm enhancements to be true. On June 13, 2019, the trial court found Thomas's prior prison terms, prior serious felony convictions, and prior strike conviction allegations to be true.

On July 9, 2019, the trial court sentenced Thomas a total term of 42 years to life. The term was composed of: an indeterminate term of 14 years to life for count 1 with an additional 10 years for the firearm enhancement, eight years (the upper term of four years, doubled) for count 4, concurrent four-year terms (the midterm of two years, doubled) for counts 3 and 6, a concurrent six-year term (the midterm of three years, doubled) for count 5, a four-year term (the midterm of two years, doubled) for count 7 that was stayed under section 654, a 10-year term for the firearm enhancement for count 4, and concurrent 10-year terms for the enhancements for counts 3 and 5. The trial court struck the enhancements for Thomas's prior prison terms.

## II.     DISCUSSION

**A.**     *Denial of Cross-Examination as to H.A.'s Potential for Bias*

Thomas argues that the trial court infringed upon his Sixth Amendment right to confront his accuser by foreclosing cross-examination as to H.A.'s actual and potential criminal prosecution by the same agency currently relying on his testimony. Because the proffered evidence would have left a reasonable jury with a significantly different impression of H.A.'s credibility, we agree it was error to permit H.A. to testify for the prosecution without submitting to the excluded cross-examination.

**1.**     *Background*

In limine, defense counsel sought leave to cross-examine H.A. regarding the potential for bias arising from what counsel proffered was (1) his alleged commission in

February 2018 of an uncharged stabbing in Santa Cruz County, and (2) his pending prosecution in the same jurisdiction for simple trespass, instead of an aggravated trespass, for a December 2018 incident "where [the trespass] was clearly aggravated." In a hearing under Evidence Code section 402, H.A. testified outside the presence of the jury that he was represented by counsel in a matter then pending in the same superior court. On the advice of counsel, who asserted H.A.'s Fifth Amendment right against self-incrimination, H.A. declined to answer questions about the alleged criminal conduct. H.A. also refused to answer whether in February of 2018, he "had some police contact with regard to a matter." H.A. agreed that in December 2018, he "had a small problem" of "hearing voices in his head," but he denied that this problem dated as far back as the date of the instant 2013 offenses. H.A. denied having received any benefit from the district attorney, including as to his pending matter, in return for his testimony against Thomas.

Defense counsel ultimately requested that the trial court grant H.A. immunity or bar him from testifying at all, but the trial court declined on the ground that the proposed cross-examination was irrelevant. The trial court reasoned that, absent "evidence . . . that shows that there has been any benefit conferred, dispensation offered, dispensation suggestion to [H.A.] in exchange for testimony in Mr. Thomas' case," the court failed to see "any level of relevance to an incident that allegedly happened five years after the subject incident."

Defense counsel clarified that she was not contending that H.A. had received or been offered any "actual benefit." Rather, her position was that H.A. might nonetheless be influenced in his testimony by the *perception* of "some benefit because of his position as a witness" for the same prosecuting agency that was pursuing the simple trespass charge and retained discretion to charge him in connection with the alleged stabbing.

20

The trial court disagreed with defense counsel's stated concern that her line of questioning was necessary to a fair trial.

## 2.    *Legal Principles*

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to test the credibility of adverse witnesses through cross-examination: " ' "[T]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" ' [Citations.]" (*Del. v. Van Arsdall* (1986) 475 U.S. 673, 678; U.S. Const., 6th Amend.)  Among the "proper and important function[s]" of the constitutional right is "the exposure of a witness' motivation in testifying."[19] (*Id.* at pp. 678-679.)  The Confrontation Clause does not prevent a trial court from restricting cross-examination of an adverse witness under Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624 (*Quartermain*); see Evid. Code, § 352 [authorizing exclusion of relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].)  But limiting cross-examination pertaining to the credibility of a prosecution witness violates the Confrontation Clause if "a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Quartermain*, *supra*, at p. 624.)

---

[19] When a witness "frustrates cross-examination by declining to answer some or all of the questions, the court may strike all or part of the witness's testimony." (*People v. Price* (1991) 1 Cal.4th 324, 421, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165; see also *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735-736 [when witness refuses to submit to cross-examination, even if refusal to answer is based on claim of privilege, the conventional remedy is to exclude the witness's testimony on direct].)

Where the relevant facts are undisputed, we review de novo claims that implicate a defendant's constitutional right to confrontation. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

### 3. *Analysis*

As a testifying witness, H.A.'s credibility—up to and including at the time of trial—was plainly at issue. (See *People v. Hinton* (2006) 37 Cal.4th 839, 887 [impeachment evidence can postdate the charged offense as impeachment "tests the defendant's credibility as a witness during trial"].) Accordingly, defense counsel sought to cross-examine H.A. regarding his potential liability for both uncharged acts and his then-pending criminal case as relevant to his credibility.

"It is longstanding law that a prosecution witness can be impeached by the mere fact of pending charges." (*People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080.) A defendant is thus "permitted to inquire whether charges are pending against a witness as a circumstance tending to show that the witness may be seeking leniency through testifying." (*People v. Claxton* (1982) 129 Cal.App.3d 638, 661.) "As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544.) "A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 (*Davis*).)

Here, the evidence of H.A.'s independent troubles with law enforcement—irrespective of the details or truth of the allegations against him—was relevant to H.A.'s present state of mind when he testified against Thomas. Although it was undisputed that H.A. had been offered no actual benefit in exchange for his testimony, "there is no requirement that [a witness's] motive to fabricate [have] a reasonable basis for its

22

existence." (*People v. Allen* (1978) 77 Cal.App.3d 924, 932 (*Allen*).)  H.A., by the time of trial, was in more than purely theoretical legal jeopardy, represented by both his pending criminal trespass prosecution and what Thomas's counsel proffered was a reported stabbing offense a year earlier.  His potential criminal exposure in the same jurisdiction was a circumstance from which the jury could have inferred that H.A. may have felt obligated to testify on behalf of the prosecution or align his testimony to the prosecution's theory of the case.

Whether H.A. had a motive to shade his testimony to match the prosecution's theory of the case or was otherwise susceptible to pressure by the prosecution by virtue of his pending charges were issues for the jury's determination, not the trial court's unilateral assessment.  (*Allen*, *supra*, 77 Cal.App.3d at p. 932.)

Moreover, the evidence would not have been unduly prejudicial.  "Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence.  The code speaks in terms of *undue* prejudice." (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)  Evidence is unduly prejudicial when "it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*Id.* at p. 439.)  Here, introducing the specific evidence underlying H.A.'s alleged criminal conduct—i.e., eliciting that the stabbing in February 2018 involved a screwdriver—had the potential to cause undue prejudice.  Yet here, the trial court excluded *all* mention of H.A.'s uncharged conduct, even declining to compel an answer outside the presence of the jury to the foundational question of whether H.A. had been "contacted by law enforcement in relationship to another matter that he's not in court for."  We reject the proposition that a limited inquiry into the bare fact of H.A.'s pending charge and his contacts with law

23

enforcement regarding his alleged criminal activity would have inflamed the jury or necessitated an undue consumption of time. Moreover, the trial court could have mitigated any perceived potential for prejudice with a limiting instruction on the proper use of such evidence. (See *People v. Homick* (2012) 55 Cal.4th 816, 866 [limiting instruction can cure potential prejudice].) Given the minimally prejudicial nature of the evidence and its probative value as to H.A.'s credibility, we conclude that the trial court abused its discretion under Evidence Code section 352 by excluding the evidence.

More importantly, the error in limiting Thomas's cross-examination of H.A. on this subject violated his right to confront witnesses under the Sixth Amendment. By excluding Thomas from inquiring into H.A.'s uncharged acts, the trial court prohibited him from exposing potential bias in favor of the prosecution. In *Davis*, for example, the United States Supreme Court held that the petitioner was denied his right to effective cross-examination when the trial court precluded him from questioning a crucial prosecution witness about his status as a juvenile probationer at the time he identified the petitioner and at the time of trial. (*Davis*, *supra*, 415 U.S. at pp. 310-318.) Defense counsel had intended to introduce the evidence to show, or at least argue, that the witness acted out of fear or concern that his probationary status might be jeopardized, or that he might have made a faulty identification of the petitioner to deflect suspicion away from himself. (*Id.* at p. 311.) *Davis* concluded that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer, [citation], as well as of [the witness's] possible concern that he might be a suspect in the investigation." (*Id.* at pp. 317-318, fn. omitted.) *Davis* thus held that the defense counsel should have been "permitted to expose to the jury the facts from which jurors, *as the sole triers of fact and credibility*, could appropriately draw inferences relating to the reliability of the witness." (*Id.* at p. 318, italics added.)

Likewise, in *Delaware v. Van Arsdall* (1986) 475 U.S. 673 (*Delaware*), the trial court precluded the defense from cross-examining a prosecution witness about the dismissal of a criminal charge against him. (*Id.* at p. 676.) The witness acknowledged that the criminal charge had been dropped in exchange for his promise to testify at the defendant's trial, but he denied that the agreement affected the substance of his testimony. (*Ibid.*) The United States Supreme Court held that by "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated [defendant's] rights secured by the Confrontation Clause." (*Id.* at p. 679, fn. omitted.)

Here, as in *Davis*, limiting the cross-examination in this case withheld from the jury facts from which it could legitimately question H.A.'s credibility as a trial witness. (*Davis, supra*, 415 U.S. at p. 318.) And even without the undisputed quid pro quo at issue in *Delaware*, cross-examining H.A. even just about the fact of the pending prosecution and the law enforcement reports of the allegedly criminal conduct could have permitted the jury to draw an adverse inference about the veracity of H.A.'s testimony. (*Delaware, supra*, 475 U.S. at pp. 676, 679.) Despite H.A.'s denial that he received any benefit or promises in exchange for his testimony, a juror could have reasonably inferred that the continued risk of prosecution for the uncharged stabbing or amendment of the pending charges to allege an aggravated trespass—by the same agency now calling H.A. as a witness—provided him with an incentive to testify more favorably for the prosecution. (Cf. *People v. Dyer* (1988) 45 Cal.3d 26, 48 [charges against witnesses were resolved before witnesses testified against defendant; "thus, no leverage remained over these witnesses"].)[20] In other words, a reasonable juror could have "received a

---

[20] The Attorney General notes that this court should evaluate the trial court's ruling limiting H.A.'s cross-examination based on the facts before the court at the time—

25

significantly different impression" of H.A.'s credibility had Thomas been permitted to inquire into the uncharged acts. (*Delaware*, *supra*, 475 U.S. at p. 680.) We next address whether the lost opportunity to expose a potential for bias prejudicial on this record.

**B.    *Prejudice***

As an error of federal constitutional dimension, the infringement of Thomas's right to confront witnesses requires the application of the harmless-beyond-a-reasonable-doubt test articulated in *Chapman*, *supra*, 386 U.S. at page 24. (*Delaware*, *supra*, 475 U.S. at p. 684; *People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1225.) Under *Chapman*, "[t]he test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887 (*Lewis*).) In this case, we conclude that the Attorney General has not met its burden to demonstrate that the error was harmless as to any count of conviction.

H.A. was a crucial prosecution witness, if not the most crucial, as the victim of the most serious offense and the eyewitness with the closest, most extended contact with the perpetrator. His testimony was critical to the jury's determination of Thomas's guilt on the count of attempted murder, as H.A. was the only witness who testified that he heard the gun click when Thomas had the gun pointed toward his body. By that time, both C.G. and P.G. had already run toward A.B.'s house. None of the other witnesses testified

---

which would not have involved a consideration of H.A.'s evolving testimony between the first and second trials. (See *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 ["[w]e may assess the trial court's ruling only on the facts made known to it at the time it made that ruling"].) Although the differences between H.A.'s testimony in the first and second trials factors into our prejudice analysis, *post*, we conclude here that the limitation on cross-examination violated the Confrontation Clause based on the facts available to the trial court at the time it made its ruling.

that they saw Thomas attempt to fire a gun toward H.A. or heard anything consistent with an attempt to fire the gun at all; H.A.'s testimony was therefore not cumulative on this point. Likewise, H.A.'s testimony at trial was probative as to the identification of Thomas as the perpetrator of the crime, as he identified Thomas at the second trial.

Although multiple other witnesses also identified Thomas as the perpetrator—including C.G. and P.G.—the identification made by the eyewitnesses were inconsistent and suffered from multiple deficiencies. As we noted, *ante*, the eyewitnesses' descriptions of the perpetrator were varied; some eyewitness, including H.A., identified Thomas based on his clothing, but the witnesses did not consistently describe the color and characteristics of the perpetrator's clothing—in fact, H.A. initially said that he believed Thomas was wearing a hood, but Thomas was not wearing a hooded sweatshirt. The witnesses also had differing accounts about the perpetrator's skin color and other physical characteristics. And C.G.'s in-field identification of Thomas was arguably tainted by H.A.'s having already told her that the police had apprehended their assailant.

To be sure, Thomas's counsel ably exposed the inconsistencies over time in H.A.'s accounts of the crime, description of the perpetrator, and identification of Thomas, as well as H.A.'s claim that C.G. had been the driver at the time they were victimized. But evidence of H.A.'s potential bias due to his vulnerability to prosecution by this district attorney could have offered the jury an explanation for the discrepancies between his statements at Thomas's first trial, where he could neither identify Thomas nor recall the gun clicking at all, and the second trial, where his testimony supported the attempted murder charge and he positively identified Thomas in court. At the least, H.A.'s uncharged acts suggested a reason that H.A. might be inclined to align his testimony to the prosecutor's theory of the case, as he was facing unresolved criminal charges before the same court that he was testifying in. The cross-examination on potential bias having

27

been excluded, the jury had no basis to even question H.A.'s good faith in his newest, more inculpatory testimony.

As we will further address at II.D.3.b, *post*, we acknowledge the sufficiency of circumstantial evidence tending to show that it was Thomas who was the perpetrator of the crimes, aside from the eyewitness identification by H.A. The circumstantial evidence included the eyewitness description of the silver revolver to the revolver found nearby, the firing pin impressions on two rounds in the cylinder suggestive of misfires, the matching ammunition at the residence where Thomas had spent the day, and expert testimony as to the significance of markings on two rounds of that matching ammunition pointed to Thomas as the perpetrator. O.S. said that the revolver found near Ocean Street looked like the one used by the perpetrator, and there was some forensic evidence—the light firing pin marks—that suggested that the revolver that was found made marks on the ammunition found inside the apartment of Thomas's father. That there is sufficient evidence that Thomas was the perpetrator—despite the first jury's deadlock and the duration of this jury's deliberations—has no bearing on whether the jury found the issue a close one, however. Our *Chapman* inquiry calls for us to determine whether the error in limiting Thomas's cross-examination of H.A. would have been material to *this* jury; "[t]he inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 (*Sullivan*).)

Moreover, *Chapman* review requires us to determine whether there is "any reasonable possibility that the error might have contributed to the conviction in this case." (*Lewis*, *supra*, 139 Cal.App.4th at p. 887.) Although the overwhelming character of evidence of guilt may in some cases inform our assessment of prejudice, we are unable to overlook the indications in the record that the firearm-based identification evidence was

28

not dispositive for this jury, which heard cross-examination designed to discredit the reliability of Murdock's toolmark identification linking the found revolver to the ammunition at the apartment of Thomas's father and also heard testimony from another prosecution expert, Lutz, who opined that there was insufficient microscopic detail to permit even a conclusion that the markings on the two rounds in the revolver cylinder were from that revolver's firing pin. The jury asked a number of questions during deliberations, two of which suggest they had issues with the identification of Thomas as the perpetrator—and in particular, H.A.'s account of the events. After initially requesting a readback of testimony from each of the Spanish-speaking witnesses, the jury narrowed their request to a readback of only H.A.'s testimony, and only his testimony at the second trial "in relation to 'hoodie' compared to [his] previous statement made in 2018 trial" as elicited during the defense's cross-examination. Following the readback, the jury asked for readback regarding "Officer Rodriguez's report—notes during interview with [H.A]." At trial, Rodriguez testified about H.A.'s statements at the scene, including H.A.'s initial description of the "gray hooded sweatshirt" and his post-identification description of a "gray sweater" without mention of a hood, and H.A.'s role in admonishing C.G. The jury's questions thus reflect that there may have been at least one juror who was concerned about the issue of identification—and H.A.'s testimony about what he saw that evening.

Based on the foregoing, there is a reasonable possibility that precluding Thomas from adequately cross-examining H.A. may have contributed to the verdict. Evidence tending to undermine H.A.'s present credibility would also tend to undermine the apparent strength of H.A.'s identification of Thomas as the perpetrator, as well as H.A.'s testimony about the circumstances in which he heard the perpetrator pull the revolver's trigger. Accordingly, when we consider the prejudicial impact the trial court's error, we are not convinced beyond a reasonable doubt that the limitation on H.A.'s cross-

29

examination did not contribute to the jury's verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.) We must therefore reverse the judgment.

**C.    *Prosecutorial Misconduct***

Although we find that the trial court's error in limiting H.A.'s cross-examination by itself to be prejudicial error, we further observe that the prejudice to Thomas from the one-sided admission of H.A.'s testimony was reinforced by the prosecutor's mischaracterization of the reasonable doubt standard in closing argument: "Reasonable doubt. . . . There must be something reasonable in the evidence that points to him[,] saying that he is—based on the evidence that says he's innocent; right? That's what we're looking at. There's nothing in evidence. Everything that points to him says he is guilty of these crimes. The purpose of reasonable doubt is to prevent the conviction of innocent people. That is why it is there." The trial court neither sustained nor overruled defense counsel's timely objection, stating only: "The jury will follow the law as the Court has instructed."

Even a good-faith misstatement of the law in closing argument—particularly a misstatement that would "absolve the prosecution from its … obligation to overcome reasonable doubt on all elements" (*People v. Centeno* (2014) 60 Cal.4th 659, 666)—constitutes prosecutorial error where there is a " ' "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion" ' " (*People v. Williams* (2013) 56 Cal.4th 630, 671). "What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements . . . ." (*Sullivan*, *supra*, 508 U.S. at pp. 277-278.) Accordingly, we review prejudice from prosecutorial error in misstating the reasonable doubt standard under *Chapman*. (See *People v. Fernandez* (2013) 216 Cal.App.4th 540, 564; *People v.*

30

*Katzenberger* (2009) 178 Cal.App.4th 1260, 1269 [applying *Chapman* standard of review to prosecutorial error in misstating burden of proof and reasonable doubt standard].)

We recognize the distinction between an otherwise permissible comment that a defendant has failed to counter prosecution evidence on a particular point "and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) But the prosecutor's argument here misstated the reasonable doubt standard and shifted the burden of proof to Thomas to prove he was not guilty of the charged offenses. There is no need for affirmative "evidence that says he's innocent"—a jury may properly conclude that the prosecution has failed to overcome the *presumption* of innocence beyond a reasonable doubt left by deficiencies in the prosecution's own case.

Although the prosecutor initially acknowledged that "[i]t's my burden; right" and that he had to prove "that it is the [d]efendant," the argument he proceeded to draw from this general principle conveyed that positive proof of innocence was required before a jury could find the prosecution had not met its burden, whether as to the identity of Thomas as the perpetrator or as to any individual element of any charged offense. The prosecutor's added comment that the purpose of the reasonable doubt standard was to protect the actually innocent only amplified the suggestion that Thomas was obliged to earn the presumption of innocence by meeting a burden of production.

That the jury was reasonably likely to have construed the prosecutor's remarks in an objectionable fashion was only underscored at oral argument, where the Attorney General theorized that the prosecutor's argument "was aimed at that the concept that, if [the jurors] heard the defendant tell a story that they did not believe and they found that he was not credible, then they would not have a reasonable doubt that pointed to innocence as opposed to guilt. [¶] . . . [¶] Was there something there that showed

31

[Thomas's] innocence rather than his guilt, that gave them a reasonable doubt."[21] This is precisely the objectionable interpretation the jury likely drew from the prosecutor's comments—that once Thomas elected to testify in his own defense, it became his burden to produce credible proof of innocence and that a failure to meet this new burden absolved the prosecution of its burden to overcome the presumption of innocence and the jury of its duty to nonetheless scrutinize the prosecution case for shortcomings. To be sure, the Attorney General in response to our questions went on to acknowledge that a jury could nonetheless acquit a testifying defendant whom it did not believe, but this essential clarification was absent from the prosecutor's closing argument at trial.

As we have discussed, the jury heard H.A.'s testimony without evidence from which the jury might otherwise have inferred that its evolution since Thomas's first trial—H.A.'s ability to unequivocally identify Thomas in the courtroom as the perpetrator, his new recollection of having heard two clicks of the revolver, his willingness to agree that the gun was pointed at his chest—was not merely coincidental to H.A.'s vulnerability to the prosecutor's charging discretion in his own pending and potential criminal matters. The prosecutor's misstatement of the reasonable doubt standard further eroded any likelihood that the jury's scrutiny of H.A.'s testimony met constitutional standards of due process. And although the trial court instructed the jury to "follow the law as the Court has instructed," this did nothing to correct the prosecutor's misstatement of the standard or even acknowledge the fact of the misstatement. (Cf. *People v. Mendoza* (2007) 42 Cal.4th 686, 701 [trial court's admonishment to jury to disregard statements and chastise prosecutor ameliorated prosecutorial misconduct].)

---

[21] The Attorney General's theory notwithstanding, the prosecutor did not argue that Thomas's *testimony* lacked credibility and thus could not create a reasonable doubt as to his guilt. Rather, the prosecutor argued broadly that "[t]here must be something reasonable in the evidence . . . that says he's innocent . . . ."

32

**D.**     *Remaining Issues*

Although our reversal of the judgment makes it unnecessary to reach some of Thomas's remaining claims, we address those that would either preclude or inform a retrial—whether delay in prosecution violated his Sixth Amendment right to a speedy trial; whether Fourth Amendment error limits the evidence we may consider in our review of his claim of evidentiary insufficiency or that may be admissible on retrial; and whether the evidence was insufficient to support the jury's verdicts. None of these claims has merit.

**1.**     *Delay in Prosecution*

Both the state and federal constitutions guarantee an accused criminal defendant the right to a speedy trial. (U.S. Const, 6th Amend.; Cal. Const., art. I, § 15, cl. 1; *People v. Martinez* (2000) 22 Cal.4th 750, 754 (*Martinez*).)[22] But "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause [of the Fifth Amendment], not the Speedy Trial Clause." (*United States v. MacDonald* (1982) 456 U.S. 1, 7, fn. omitted (*MacDonald*); *Martinez, supra*, 22 Cal.4th at p. 762.)

Here, the prosecutor initially dismissed the charges sometime in 2015 but later refiled them after a delay, on April 6, 2017. Thomas does not dispute that this dismissal was in good faith. Accordingly, despite Thomas's reliance on the presumption of prejudice available under Sixth Amendment speedy trial jurisprudence (see *Doggett v.*

---

[22] On appeal, Thomas does not make a specific argument pertaining to his right to a speedy trial under the California Constitution, other than a generic assertion in his opening brief that his "state and federal rights to a speedy trial" were violated. The record does not reflect that Thomas raised in the trial court any speedy trial claim under the California Constitution.

*United States* (1992) 505 U.S. 647, 652, fn. 1), the gravamen of Thomas's claim is the extent of *precharge* delay. We therefore analyze Thomas's claim under the due process clause of the Fifth Amendment, as no charges were pending during the period of the delay,[23] and we further conclude that Thomas has failed to demonstrate substantial prejudice that would warrant a dismissal under the due process clause.

### a. *Legal Principles and Standard of Review*

The Fifth Amendment guarantee of due process of law "require[s] dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." (*United States v. Marion* (1971) 404 U.S. 307, 324, fn. omitted (*Marion*).) A showing of actual prejudice is likewise a prerequisite "to establish[ing] a violation of our state Constitution's speedy trial right." (*Martinez, supra*, 22 Cal.4th at p. 756.)[24]

If a defendant establishes prejudice from preindictment delay, "the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. [Citation.] But if the defendant fails to meet his or her burden of showing prejudice, there is no need to

---

[23] Thomas argues that his case is distinguishable from *MacDonald* in that he remained in custody on other matters even after case number F26035 was dismissed. (See, e.g., *Klopfer v. North Carolina* (1967) 386 U.S. 213 [holding that North Carolina provision for "nolle prosequi with leave," which permitted criminal proceeding to remain in abeyance, was not equivalent to a dismissal under *MacDonald*].) Although Thomas remained under restraint notwithstanding the prosecution's unqualified dismissal of case number F26035, this restraint was not a consequence of the instant charges but of the unrelated "jail matters" that he references in his motion to dismiss.

[24] In contrast, delay exceeding one year has been deemed to be presumptively prejudicial under the Sixth Amendment right to a speedy trial. (See *Doggett, supra*, 505 U.S. at p. 652, fn. 1, italics omitted.)

determine whether the delay was justified." (*People v. Abel* (2012) 53 Cal.4th 891, 909 (*Abel*).)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [under the state constitution] [citation], and defer to any underlying factual findings if substantial evidence supports them." (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).) Likewise, federal courts have held that reviewing courts "review for abuse of discretion the [lower] court's decision to dismiss an indictment for preindictment delay, under . . . the Fifth Amendment Due Process Clause." (*U.S. v. Huntley* (1992) 976 F.2d 1287, 1290 (*Huntley*).)

### b. *Prejudice*

In this case, Thomas makes a generalized assertion of prejudice, arguing that the witnesses' memories may have faded by the time of his first trial. Thomas, however, does not posit that specific witnesses were no longer able to testify, though he speculatively argues that certain witnesses who may have been homeless and living near the levee where Thomas went to go drink that night may no longer be located, an argument that is unsupported by the evidence in the record. There was no testimony or evidence that anyone near the levee saw Thomas, and Thomas himself testified that he was alone at the levee and saw no one while he was there.

Moreover, Thomas does not otherwise explain how the fading memories of prosecution eyewitnesses impaired his ability to defend himself, rather than impairing the prosecution case. Despite the delay in refiling the charges, the witnesses had each spoken with officers about what transpired as part of the police investigation and described the perpetrator at that time. Furthermore, witnesses like C.G., P.G., and H.A. made their infield identifications of Thomas shortly after the crime occurred. Although their inability to recall certain details during the first trial may in theory have prejudiced Thomas, any prejudice would have been insubstantial on this record. (See *Cowan*, *supra*,

35

50 Cal.4th at p. 433 [witnesses' faded memories were "minimal[ly]" prejudicial as one witness's testimony was cumulative and another had already spoken to officers].) Additionally, the testimony of eyewitnesses was circumstantially corroborated by physical evidence that linked Thomas to the malfunctioning revolver—the matching ammunition found inside the apartment of Thomas's father, where Thomas had been with E.H. just before the offense, and evidence that that two rounds of the semiautomatic ammunition from the apartment bore firing pin impressions consistent with the revolver's tendency to misfire this type of ammunition.

Thomas claims that he was prejudiced because H.A. gained an incentive to testify favorably for the prosecution due to H.A. being charged between the first and second trials with trespassing and stabbing in an unrelated criminal matter. Yet the mere timing of H.A.'s own legal difficulties has no bearing on precharging delay—the interval between the period of Thomas's arrest and the 2017 refiling of the information. Even assuming that the emergence of a heightened incentive to testify favorably for the prosecution is cognizable as a matter of due process, this incentive developed *after* the district attorney refiled the charges and indeed after Thomas's first trial.

Although Thomas claims that there is no justification for the delay in refiling, we examine the reason for delay only if Thomas has met his burden to demonstrate prejudice. (See *Abel*, *supra*, 53 Cal.4th at p. 909.) To the extent Thomas does not dispute that the prosecutor represented that the dismissal of case number F26035 was to permit the state to undertake additional forensic analysis, we note the instruction of the California Supreme Court that "[i]nvestigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided." (*People v. Nelson* (2008) 43 Cal.4th 1241, 1256.)

36

Although it is not apparent what additional forensic analysis the delay in fact facilitated, we have no basis on this record to question the prosecution's good faith. There is no evidence that the delay was an "intentional device to gain tactical advantage" over Thomas. (*Marion*, *supra*, 404 U.S. at p. 324.) For example, in *U.S. v. Lovasco* (1977) 431 U.S. 783, the United States Supreme Court noted that despite the lack of evidence justifying a preindictment delay, the court must assume that prosecutor's representations to district court and appellate court that the investigation continued was made in good faith. (*Id.* at p. 796.)

Under these circumstances, we discern no abuse of discretion in the trial court's denial of Thomas's motion to dismiss. (*Cowan*, *supra*, 50 Cal.4th at p. 431; *Huntley*, *supra*, 976 F.2d at p. 1290.)

### 2. *Motion to Quash/Traverse the Search Warrant*

Our conclusion as to the sufficiency of the evidence, *post*, is based in large part on evidence Thomas argues should have been suppressed, on the theory that the trial court erred when it denied his motion to quash or traverse the search warrant of Thomas's father's home. He argues that the search warrant was overbroad and all evidence seized in the search of his father's home must be suppressed. As we explain, even if we assume that the warrant was overbroad in that the magistrate authorized in this initial warrant the search of digital media and electronic devices found at the residence, we see nothing in the record to indicate that any evidence admitted at trial was uncovered as a consequence of this overbreadth.

The search warrant here authorized not merely the seizure of firearms, firearm parts, or ammunition, but also a search of electronic devices, including "[a]ll cellular telephones, tablets, electronic data processing and storage devices, computers and computer systems" and other storage devices, " for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk

37

configurations, date and time, and unallocated and slack space, for evidence[,]" specifically evidence of gang membership, including items "stored in an electronic or digital format in any storage device[.]"[25]

Assuming that the inclusion of a provision generally authorizing a search of all electronic devices rendered the warrant overbroad, "invalid portions of a warrant are severable from the valid portions." (*People v. Smith* (1986) 180 Cal.App.3d 72, 89.) And "an overbroad warrant may be upheld as to valid portions where there is probable cause to seize some of the items specified in the warrant although not others." (*People v. Joubert* (1983) 140 Cal.App.3d 946, 952.) In this case, what we treat as the overbroad portions of the warrant—the search and seizure of electronic devices and of various gang indicia—can be severed from the concededly valid portions of the warrant, which were directed toward indicia that Thomas stayed in his father's apartment and of firearms and ammunition.

Thomas does not identify any digital or gang evidence admitted at trial, nor does he articulate any theory by which law enforcement's seizure of evidence pursuant to the warrant was attributable to the challenged overbreadth and not the warrant's valid authorization of a search for firearms, ammunition, and indicia of Thomas's dominion and control. The evidence identified at trial as deriving from the search of the apartment consisted of documents indicating that Thomas sometimes stayed in the apartment, some ammunition, and a knife[26] that was found in a shoebox along with the ammunition.

---

[25] The return to the warrant indicated that several cell phones, various gang indicia, photographs, indicia of Thomas's presence, and a laptop were seized during the search.

[26] Given our reversal on other grounds, we need not reach Thomas's separate challenge, under Evidence Code sections 350 and 352, to the admissibility of the knife. Although the probative value of the knife is not apparent to us this record, we will not presume what theory of relevance the prosecution might articulate on retrial.

Thomas does not contest that these items were validly specified or that there was probable cause to support their search and seizure. (*People v. Kraft* (2000) 23 Cal.4th 978, 1043-1044 [even if warrant was overbroad, evidence would have inevitably been discovered during search for items validly specified in the warrant].) Thus, even if a search of all electronic devices "for evidence" and for gang indicia were overbroad, there was no resulting trial error. (*People v. Ulloa* (2002) 101 Cal.App.4th 1000, 1005-1006.)

Thomas argues that this court should follow *Burrows v. Superior Court*, (1974) 13 Cal.3d 238, which he misconstrues as disfavoring severability analysis and supporting the exclusion of all evidence seized as part of a warrant that is overbroad in any respect. In *Burrows*, the California Supreme Court deemed invalid and overbroad a search warrant that authorized a search of an attorney's office for " 'all books, records, accounts and bank statements and cancelled checks of the receipt and disbursement of money' "— without limitation—as well as " 'any file or documents referring' " to his client. (*Id.* at p. 241.) The court in *Burrows* considered whether the part of the warrant that specifically related to named persons was severable. It ultimately concluded, however, that even the purportedly valid provision of the otherwise severable warrant, "the direction to seize 'any file or documents' relating to the [clients, was] too broad to comport with constitutional requirements": the information upon which the warrant was based justified only a search of *financial* records, and not, for example, other documents related to the attorney's work on behalf of his clients. (*Id.* at p. 251.) Here, Thomas makes no cogent argument that the searches for indicia of Thomas's presence at his father's apartment or for firearms and ammunition were not sufficiently particular or were unsupported by probable cause.

Accordingly, we conclude that the trial court did not err when it denied Thomas's motion to quash or traverse the warrant and to suppress the evidence seized during the search.

### 3.    *Sufficiency of the Evidence*

In reviewing a challenge to the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)  In contrast to our *Chapman* review of constitutional errors, *ante* at section II.B., our review of sufficiency of the evidence is highly deferential.  (See *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.)  Viewing the evidence in the light most favorable to the prosecution, we look solely to whether the verdict is supported by substantial evidence—"evidence that is reasonable, credible, and of solid value"— without resolving credibility disputes or evidentiary conflicts.  (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*)  Thomas's challenge to the sufficiency of the evidence to support his convictions rests on the asserted inoperability of the firearm—as it relates to both its ability to inflict injury and the intent of the perpetrator necessary to assault—and the vagaries of the eyewitness testimony as to identity and attempts to fire at H.A.  None of his theories of insufficiency precludes his retrial.

#### a.    *The Firearm*

Thomas argues that he lacked the requisite present ability to cause a violent injury because the revolver that was found was not only damaged but loaded with incompatible ammunition.  He further argues that the inoperability of the firearm undermines the sufficiency of evidence that he had the requisite mental state to be convicted of either assault or attempted murder.

An assault "requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th

40

779, 790; see also § 240 ["an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"].) "To point a loaded gun in a threatening manner at another . . . constitutes an assault, because one who does so has the present ability to inflict a violent injury on the other and the act by its nature will probably and directly result in such injury." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.)

Thomas's arguments give short shrift to the evidence from which the jury could legitimately find that (1) the revolver, though unreliable and dangerous to fire, was not wholly inoperable and, under a narrow range of circumstances, could be made to fire a live round of even the incompatible .380 automatic ammunition with which it was loaded, and (2) that he knew that the revolver was operable. Tripp was occasionally able to detonate primed casings when he test-fired the revolver at a 45-degree angle. And Tripp opined that, if loaded with the incorrect .380 automatic ammunition, the revolver could fire a round, "under [the right] circumstances." As to whether Thomas was aware of those right circumstances, the evidence found at the apartment where Thomas maintained at least some possessions included an apparently used firing range target as well as two unspent rounds of ammunition bearing marks consistent with misfires. Moreover, S.B.'s testimony that the gunman raised the gun at an angle, barrel up, permitted the jury to infer, as the prosecutor argued, that Thomas knew what Tripp would later determine in testing about the optimal angle for firing the revolver and was therefore "capable of inflicting injury on the given occasion, even if some steps remain to be taken." (See *People v. Chance* (2008) 44 Cal.4th 1164, 1171 [injury need not "necessarily be the instantaneous result of the defendant's conduct"]; *People v. Ranson* (1974) 40 Cal.App.3d 317, 321 [trier of fact could properly infer defendant's knowledge of how to rectify firearm malfunction and thereby inflict injury].)

Accordingly, there was sufficient evidence from which the jury could determine the perpetrator had the present ability to fire a live round under the right conditions, that

Thomas had used the firearm before and had some awareness of how it could be made to function. Under our deferential review for substantial evidence, no more is required.

### b. *The Eyewitness Identifications*

We recognize that the witnesses' identification of Thomas as the perpetrator in this case is far from perfect, given the discrepancies in some of their own statements and their varied descriptions of the perpetrator's clothes, ethnicity, and build. Yet the "[i]dentification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 480; *People v. Reed* (2018) 4 Cal.5th 989, 1006.) And "when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court." (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) H.A., C.G., and P.G. all positively identified Thomas during the infield show-up that evening and in the trial court. In our deferential review for substantial evidence, however, we do not resolve challenges to witness credibility or second-guess the trier of fact's assessment of the reliability of eyewitness identifications. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Thomas argues that the eyewitness identifications were unreliable to the extent that the witnesses' testimony became "physically impossible or inherently improbable." (*People v. Romero* (2019) 44 Cal.App.5th 381, 386.) "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729 (*Ennis*).) Thus, " ' "[t]o warrant the rejection of the statements given by a witness who has been believed by [a trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*Id.* at p. 728.) No such physical

42

impossibility or inherent improbability is present on this record. It was not impossible for Thomas to be the perpetrator solely because his DNA and fingerprints were not found at the scene.[27] Thomas's argument that the witnesses' statements were improbable relies not on anything inherent in each of their statements but on an inference of unreliability he would have us draw from the record as a whole, thereby intruding on the province of the trier of fact. (*People v. Navarro* (2021) 12 Cal.5th 285, 302 (*Navarro*).) Accordingly, we conclude that viewing the evidence in the light most favorable to the prosecution, sufficient evidence supports the jury's determination that Thomas was the perpetrator. (See *Zamudio*, *supra*, 43 Cal.4th at p. 357.)

### c. *Intent to Kill H.A.*

Thomas further argues that inconsistencies in H.A.'s testimony about the orientation of the revolver when Thomas pulled the trigger fatally undermined the viability of the charge of attempted murder of H.A. Here again, Thomas's challenge would have us reweigh H.A.'s various statements and determine which account merited the jury's credence. It is true that in previous statements, H.A. said variously that he did not remember the assailant pulling the trigger and that he believed that gun was *not* aimed at him when the trigger was pulled. But Thomas's argument goes to the relative credibility of H.A.'s accounts of the crime and the weight that the jury should have accorded to his testimony, as opposed to prior inconsistent statements. (*Navarro*, *supra*, 12 Cal.5th at p. 302.) To the extent that H.A.'s testimony presented inconsistencies, whether internal or in relation to other evidence, those conflicts were matters for the jury to resolve.

---

[27] Thomas notes that defense expert Taylor opined that his DNA was excluded from the gun, but the prosecutor's expert noted that her results were inconclusive. In short, the DNA evidence does not render it impossible for Thomas to be the perpetrator.

H.A.'s trial testimony, construed in the light most favorable to the judgment, supported the jury's determination that Thomas intended to kill him, even if the jury could reasonably have rejected that inference. " ' "[T]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' " ' " (*People v. Perez* (2010) 50 Cal.4th 222, 230.) The inference is supported even in the absence of "advance consideration." (*People v. Arias* (1996) 13 Cal.4th 92, 162.)

Multiple appellate courts have held that substantial evidence supports a conviction for attempted murder when there is evidence that the defendant fired a gun toward a victim, even if not precisely targeted. (See, e.g., *People v. Ramos* (2011) 193 Cal.App.4th 43, 47-48 [affirming attempted murder conviction where the defendant fired at the victim approximately seven times "from a distance during nighttime" as the victim ran and the gunshots "could have inflicted a mortal wound had [the defendant's] marksmanship been better"]; *People v. Lashley* (1991) 1 Cal.App.4th 938, 943-945 [reasoning "[t]he very act of firing a .22 caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill under the circumstances presented here"]; *People v. Perez* (2010) 50 Cal.4th 222, 230 [affirming where a "rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon"].)

At trial, H.A. testified that Thomas pointed the gun at him and pulled the trigger, albeit ineffectually. Thomas was close to H.A. at the time he pulled the trigger; H.A. testified that Thomas was approximately, "six, eight, seven feet" away from him when he stepped outside of C.G.'s car. H.A. said that Thomas pointed the gun "at all sides," and

44

when asked if by "all sides" H.A. meant "around [him] or all sides of [H.A.'s] body," H.A. responded that the gun was pointed "[t]o my body."

Even though a jury might reasonably have rejected the inference that Thomas, when he pulled the trigger, was pointing the revolver at H.A., evidence is not "insufficient . . . simply because the circumstances reasonably might support a contrary finding." (*People v. Solomon* (2010) 49 Cal.4th 792, 818.)  Viewing the evidence in the light most favorable to the judgment, as we must, we conclude that the jury could reasonably infer that Thomas had the intent to kill because he pulled the trigger at close range while the gun was pointed toward H.A.'s body.

Because the evidence at trial was sufficient to support the jury verdicts, our conclusion that reversal is otherwise warranted does not preclude further retrial on remand.  (Compare *Burks v. United States* (1978) 437 U.S. 1, 14-15 with *People v. Hernandez* (2003) 30 Cal.4th 1, 10.)

### III.  DISPOSITION

The judgment is reversed.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Thomas*
H047082